UNITED STATES DISTRICT COURT
for the
EASTERN DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE
2014 DEC 11 PM 4 49
U.S. DISTRICT COURT
DISTRICT OF MASS

| | |
|---|---|
| NEAL F.X. KIMBALL,<br>DIETER M. GROLL,<br>Plaintiffs,<br>v.<br><br>TOWN OF PROVINCETOWN,<br>OFFICER SCOTT D. CHOVANEC,<br>CHIEF OF POLICE JEFF D. JARAN,<br>Defendants. | Civil Action No. ____________<br><br>**COMPLAINT AND DEMAND FOR A JURY TRIAL** |

## INTRODUCTION & SUMMARY OF COMPLAINT

1. This is an action for money damages for violations of the plaintiffs' constitutional rights brought pursuant to 42 U.S.C. §§ 1983 and 1988, and related state law. Plaintiffs Neal Kimball and Dieter Groll, appearing *pro se*, allege that defendant Town of Provincetown Police Officer Chovanec conspired with Kimball's commercial landlord to misuse his authority under color of law to trespass and forcibly enter onto the premises of the plaintiffs, and through the use of intimidation and the threat of arrest, effectuated an unlawful eviction and unreasonable seizure of their office space and personal property, in contravention of the Summary Process as defined under Massachusetts law. Claims arise from the defendants' use of threats and intimidation under color of law so as to deprive plaintiffs' constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution and under the Massachusetts Constitution to be free from unreasonable seizures by the State, and their right to due process of law – together with tort claims for these and other negligent or intentional acts committed by members of the Provincetown Police Department while acting under color of their state authority. Plaintiffs further allege that these deprivations lasted for a period of weeks, during which time defendant Chovanec conspired with and was joined by defendant Jeff D. Jaran, then Chief of Police, each of whom continued using threats and intimidation against plaintiffs, while

acting under color of law, in furtherance of their enterprise to interfere with the Summary Process, to deprive the plaintiffs of their personal property, and to prevent the plaintiffs from asserting a complaint against the defendants. Claims arise for municipal liability and for supervisory liability against Police Chief Jeff Jaran and the Town of Provincetown (the "Town"). Defendant Town of Provincetown had a custom and practice of permitting, and even encouraging, its officers to use their official status to intimidate citizens in this and other manners. This far-reaching and well-documented custom and policy of deliberate indifference to the constitutional rights of its citizens was the moving force behind the violation of the plaintiffs' Fourth and Fourteenth Amendment rights.

## JURISDICTION

2. This action arises under a federal statute, the Federal Civil Rights Act, 42 U.S.C. §§ 1983 and 1988. Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343(a)(3). The plaintiffs further invoke the pendent jurisdiction of this Court under 28 U.S.C. § 1367 to consider claims arising under state law sounding in tort, the Massachusetts Tort Claim Act, M.G.L. Chapter 258 § 4, the Declaration of Rights of the Massachusetts Constitution, the Massachusetts Civil Rights Act, M.G.L. Chapter 12, § 11I, and under Massachusetts common law.

3. There exists between the parties an actual controversy justiciable in nature.

## PARTIES

4. The plaintiffs Neal F.X Kimball and Dieter M. Groll are natural persons with a usual residence in Provincetown, Barnstable County, Massachusetts. Plaintiffs are citizens and residents of the United States and the Commonwealth of Massachusetts and are entitled to protections of the United States Constitution and the Massachusetts Declaration of Rights.

5. The defendant Town of Provincetown (hereafter, the "Town") has at all times relevant hereto been a Municipal Corporation duly established under the laws of the Commonwealth of

Massachusetts. The Town of Provincetown, through its officers, employees and/or agents, was at all times responsible for the practices, customs and policies of the Town of Provincetown Police Department and for all of its individual members, including adequate training, supervising, investigating and disciplining of the chief of police, police supervisory officials and police officers.

6. The defendant Officer Scott D. Chovanec has at all times relevant to the allegations of this Complaint been a fully-uniformed Police Officer, displaying a badge and a firearm, acting under color of law as an agent/employee for the Town of Provincetown, Barnstable County, in the Commonwealth of Massachusetts. He now resides in the State of Louisiana, and is sued individually and in his capacity as a police officer for the defendant Town of Provincetown.

7. Defendant Chief Jeff D. Jaran has at all times relevant to the allegations of this Complaint been the Chief of the Provincetown Police Department, acting under color of law as a fully-uniformed officer, displaying a badge and a firearm, and driving a police cruiser, as agent/employee for, and as the highest-ranked decision-maker and policymaker for the Town of Provincetown, Barnstable County, in the Commonwealth of Massachusetts. He now resides in the State of New Hampshire, and is sued individually and in his capacity as Chief of Police for the defendant Town of Provincetown.

## FACTS

8. The plaintiffs, Neal Kimball, an architectural designer, and Dieter Groll, a computer consultant, now-aged 55 and 47, respectively, have been partners for 24 years, and have owned their home in Provincetown, which Kimball designed, and which they built in 1994. Kimball has been a full-time resident since 2001, and Groll since 2002.

9. By 2005, Kimball had built a thriving design firm, doing business as Kimball Residential Designs ("KRD"), which, together with two other designers' firms, handled virtually the entire

local market for the design of new constructions, additions, and renovations of both commercial and residential properties.

10. Also in 2005, KRD, as 50% owner of 135 Bradford Street LLC (the "LLC"), purchased a 2,700 square-foot, two story commercial condominium in a mixed-use building, located at 135 Bradford Street, at the highly-visible intersection of Bradford and Standish Streets, in the center of Town. Bradford Street, also known as Massachusetts Route 6A, is the Town's primary East-West thoroughfare – one of only two that run the length of the Town.

11. Over the next 3 ½ years, the LLC completed extensive renovations to the building, sub-dividing it into one residential plus three commercial units. During that time, the real estate market suffered a substantial decline. The LLC sold the residential unit and one commercial unit; KRD occupied Unit F – being the second-floor, corner unit – and a shipping and copy center occupied the remaining unit, as the LLC's tenant.

12. In 2007, the Town hired Russell Braun as its Building Commissioner. Braun, himself an architect, initiated a policy of discrimination and withholding permits against non-architect designers, and by 2010, all three designers had been virtually eliminated from the local marketplace. (Although this illegal practice would have been actionable at the time, the statute of limitations for that injury has since expired, and is therefore not included as a claim herein.)

13. In July, 2011, as a result of these two market forces, the LLC lost the two remaining units to bank foreclosure of their mortgage, and Kimball became the tenant of his unit's new owner, Richard Campbell (hereafter, "Landlord").

14. Since 2009, plaintiff Groll had also utilized his partner's office as a base for his computer consulting and repair business; he therefore kept his own business assets (i.e. computers) as well as client-owned assets at this location. This informal sub-tenancy was well-known and accepted by the Landlord.

15. On October 4, 2011, the Landlord served a 14-Day Notice to Quit for Non-Payment of Rent to Kimball (as "Tenant"), and on October 21, 2011, a Summary Process Eviction Summons was served to Kimball. Groll (as "Sub-Tenant") was not named in either document.

16. The plaintiffs resolved that they would leave amicably, and therefore did not mount any challenge during the eviction proceedings. On November 14, 2011, therefore, a default judgment was entered pursuant to M.G.L. c. 239 § 3 and Massachusetts Uniform Summary Process Rule (SPR) 10.

17. M.G.L. c. 239 § 5 and SPR 13 both prohibit the issuance of execution in a summary process action prior to the expiration of ten days after the entry of judgment. That mandatory "appeal period" was clearly indicated on the notice of judgment that was provided by the Court to both parties.

18. Given that the ten-day period was set to expire on Thanksgiving Day, Thursday, November 24, 2011, the plaintiffs planned to shut down the office on the morning of Friday, November 18, 2011 with the help of Kimball's office manager, Susan Leonard. They planned to use the six remaining days to pack and move the office in an orderly fashion, allowing sufficient time to complete the move by the end of the day on Wednesday, November 23, 2011. That plan would have allowed ample opportunity to honor the judgment of the Court by completely vacating the premises, thereby sparing both the Landlord and themselves of the expense and unpleasantries of an execution and sheriff's eviction. They had a large cadre of friends lined up to help with the move during this this time. None of the plaintiffs' plans, however, would in fact come to fruition – through no fault of their own.

19. Just after 11 AM on Friday, November 18, 2011, Kimball's office manager, Susan Leonard, had just arrived to help pack up client files, when the front door to the unit was suddenly

unlocked and opened, without so much as a knock. The Landlord entered, followed by defendant Officer Scott D. Chovanec and an employee of Outer Cape Locksmiths.

20. While defendant Chovanec took up a position on the other side of the room, the Landlord proclaimed, "Your time is up. You need to leave, or you'll be physically removed from the property".

21. Following a simple nod from the Landlord, the locksmith immediately knelt down and started changing the locks; no words were exchanged between the Landlord and the locksmith, who also proceeded to change the locks on the rear door of the unit.

22. This forcible entry into the premises in violation of M.G.L. ch. 184 § 18 – especially given the "constructive force" employed by the presence of the police officer – caused Kimball, Groll and Leonard to experience intimidation, coercion, anxiety, and fear for their personal safety, under an explicit threat of "physical removal", as voiced by the landlord, coupled with an implicit threat of arrest by the police officer. Ms. Leonard was so frightened that she immediately left the premises, never to return.

23. The presence of the police officer also intimidated the plaintiffs so as to prevent them from exercising their common law right to use reasonable force to protect their property from private action – an action that the officer knew (or should have known) to be illegal.

24. Having been caught completely off-guard, plaintiffs objected that Landlord was "jumping the gun", but they managed only to negotiate a few hours "to pack what we can".

25. None of that time, in fact, was spent packing; they instead tried to comprehend what had just transpired, and under what legal authority, but they could find none. Everyone they spoke to, including, *inter alia*, an attorney and several members of the staff in the Court Clerk's office at the Orleans District Court, confirmed the plaintiffs' understanding of the Summary Process. Each confirmed that the police and Landlord had no authority to support their summary

eviction of the plaintiffs in contravention of established state eviction procedures. When plaintiff Groll called Barnstable County Deputy Sheriff Ron Chevalier and described that morning's events, Deputy Chevalier's immediate response was, "They can't do that, that's my job!"

26. The plaintiffs could not comprehend why the Landlord would seek to prevent them from removing their personal property from the premises; the only reasonable conclusion they could think of was that this was an attempted conversion of said property, including such expensive equipment as a large-format plotter, computer servers, and some valuable furniture pieces.

27. When the Landlord returned that evening, the plaintiffs attempted to explain to him what they had learned, but it quickly escalated into a shouting match. Both parties accused the other of trespass, and each commanded the other to immediately leave the premises.

28. The Landlord called the police, and officers Meredith Lobur and Thomas Koumanelis arrived. Groll informed them that he had spoken with the Court and with the Deputy Sheriff, and that the matter was still in the hands of the Court, which had not yet issued an eviction order. Groll stated, "I don't understand why you're even here, because this is a civil matter." Officer Lobur replied (incorrectly), "He could issue a 'no trespassing order', which would make it a criminal issue."

29. Groll explained that he and Kimball were planning to move out over the weekend, but if the Landlord succeeded in removing them and in locking them out, he was not only interfering with their right to remove their belongings in an orderly fashion, but he was also circumventing and interfering with the Summary Process. "We're trying to do this in a reasonable manner. But his showing up today was not justified," Groll said.

30. The officers went outside to speak to the Landlord, and convinced him to allow more time.

Returning inside, the officers explained that the Landlord had agreed to leave for the evening, but that he would be back at Noon the next day.

31. Unable to turn to the police for assistance, and knowing that they no longer possessed keys to their unit, plaintiffs were forced to spent that Friday night in the office, unable to return home to eat, sleep or shower, fearing that once they left, they would no longer have physical possession of the unit, and would not be able to return to remove their belongings and office equipment. They resolved to keep at least one of their number present around the clock, so as not to relinquish physical possession, while they attempted to learn how to seek injunctive relief from the Orleans District Court first thing on Monday morning, if only they could keep the situation simmering until then.

32. Just after Noon on Saturday, November 19, 2011, however, the Landlord and defendant Chovanec returned. Groll opened the conversation by saying "Well, there's still the open question as to which of us is trespassing... and we know that *we're* not." The conversation quickly escalated. Despite that clearly-established, settled law required Chovanec to remove himself and the Landlord from the property, he instead took immediate control by saying, *"You know what? We're not going to argue this. We're going to stop talking about it, and you guys are going to leave. OK? That's why I'm here."* The Landlord echoed, *"Right!"*

33. Chovanec told Groll and Kimball, directly and in no uncertain terms, *"You have fifteen minutes to grab whatever you need and leave the property, or you will be arrested."*

34. For the third time in two days, the plaintiffs experienced intimidation, coercion, anxiety, and fear – yet on this day, it felt far more intense, by orders of magnitude. A day earlier, the threat of arrest was strong enough to cause Ms. Leonard to leave work, but that was merely a faint, implied shadow compared to the dark threat that had just become an explicit and imminent

reality. Plaintiffs feared for their personal safety under this clear and present threat of immediate arrest.

35. As the plaintiffs frantically scrambled to gather critical essentials within just a few short minutes, Chovanec reminded them that once they had left, if they were to return to the property without the Landlord as their escort, they would be trespassing and would be arrested. Groll asked, "What would happen, hypothetically – since Neal is still in possession of the unit until he walks out that door – and since we are still days away from the Sheriff serving a court order, if Neal instead says he's not going to walk out the door?" *"You will both be arrested"*, was Chovanec's immediate reply. By this point, he had completely abandoned his official police duty, and instead embraced his mercenary-like role, acting as a private agent of the Landlord.

36. While packing during those 15 minutes, Groll "lectured" the Landlord and defendant about the illegality of their actions, and Groll promised them that they would meet again in court.

37. At 12:30 PM, exactly 15 minutes after Chovanec delivered the ultimatum, the plaintiffs were escorted off of the property, carrying only those boxes and bags that they could in a single trip.

38. Almost immediately upon arriving home, as the adrenaline began to subside, Kimball was overcome and incapacitated by a massive and crippling panic attack, unlike he had ever experienced before. It was only then that he discovered that in his haste to leave the office, he had left both his blood pressure medication and his anti-anxiety medication inside the now-shuttered property.

39. After several hours of frantic attempts to contact the landlord both by telephone and at his home, the plaintiffs were only able to regain entry into the building after they went to the police station, asking them to intervene and contact the Landlord. Escorted by the police and the Landlord, the plaintiffs finally retrieved Kimball's medication at approximately 7:30 PM.

40. The Provincetown Police Department call logs reflect the following four entries:

i. Call #11-20753 (Fri. 11/18/2011 10:54 AM) "Richard Campbell in lobby requesting an *escort* to his building *for an eviction* involving Neal Kimball; *will be changing the locks*." (emphasis added).

ii. Call #11-20779 (Fri. 11/18/2011, 9:26 PM) "Richard Campbell on the E911 line requesting P.O. as previously in the day *P.O. assisted [requesting party] w/ eviction* [See Call] 11-20753. Now [Kimball] back (sic) on site refusing to leave." (emphasis added)

iii. Call #11-20802 (Sat. 11/19/2011, 12:02 PM) "[Landlord] in the lobby requesting P.O. to 135 Bradford St. Unit F, ongoing issues w/ tenant, *subject being evicted* and afraid party may refuse to leave. ... 12:13 status check; A14 advised *subject getting ready to leave.* [Arrived] 12:06:01 [Cleared] 12:32:27" (emphasis added)

iv. Call #11-20835 (11/19/2011 7:17 PM) "Neal Kimball and Dieter Groll in lobby requesting to retrieve items from office ... issue earlier with landlord tenant, see case # 11-20802. [They've] been trying to reach him since 2PM. Kimball having a family emergency and needs medications in the office. (7:19 PM) [Landlord] advised, will meet them on location in 4-5 minutes, requesting a police officer be present."

41. At no time before, during, or in-between any of the incidents described above, did any police officer, or any other Town employee, have in their possession a lawful Writ of Execution for Possession of the premises. In fact, none of them possessed, *nor had even seen*, any official document at all that was related to this matter in any way. Despite Plaintiffs' many verbal protests, not once did anyone seek to verify either side's "story"; instead, they took the Landlord's word in blind faith as fact, with a deliberate indifference to the truth of the matter.

42. Exactly as the plaintiffs had asserted all along, the Writ of Execution for Possession was issued by the Orleans District Court on November 25, 2011. The Landlord presented the Writ to the Barnstable County Deputy Sheriff on December 8th, 2011. The Deputy Sheriff, in turn, delivered a Notice of Scheduled Eviction to the plaintiffs later that day, with the eviction scheduled for Monday, December 12, 2011 at 10:00 AM.

43. Between November 19 and December 8, 2011, plaintiffs had only been allowed to make three or four brief, supervised visits into the office to retrieve critically-essential items, each time escorted by the Landlord. Plaintiffs were finally able to begin their move late in the day on December 8, 2011, leaving them roughly 3.5 days in which to complete the move.

44. That move was extremely chaotic, with a very small handful of friends – less than half of the originally-planned crew, as several of the original crew had left the town for the winter. At the outset of the weekend, the team only had Kimball's pickup truck and Groll's sedan as their only means of transport until the Landlord managed to secure a small moving truck. Further still, everyone felt intense pressure under the weight of a looming "drop-dead" deadline upon the arrival of the Deputy Sheriff on Monday morning. In short, they had to do the impossible, with less than half of their crew, and just over half of the time originally allotted.

45. Everyone on the team was forced to make snap decisions, often unilaterally, not only as to what, where, and how items got packed, but also as to which items got tossed out the window – literally – into the dumpster below from the 2nd floor unit.

46. At one point over the weekend, as furniture was staged onto the curb, a desk and a Herman Miller Aeron chair (itself valued at over $650) were stolen when they were left unattended, while the team was at the plaintiffs' home, unloading a truck-load into their driveway. Upon

return, the plaintiffs discovered the loss, and waved over defendant Chovanec – who had, by then, taken up a position in his car across the street. He jotted a note about these stolen items on his notepad, but plaintiffs believe that Chovanec did nothing with that information. The stolen items were never recovered.

47. Late in the afternoon of Sunday, December 11, 2011 – perhaps 18 hours or so before the scheduled "drop-dead" time – defendant Chovanec once again walked into the office, to speak with the plaintiffs. This time, he advised them about a "complaint" that he had received from a client of Kimball's, who was attempting to "retrieve his file folder" from Kimball.

48. Groll explained that their last contact with the client was when he had called Kimball's office on that fateful morning of November 18, 2011, just minutes before defendant Chovanec and the Landlord made their first forcible entry into the office. Kimball had been on another call, so Groll spoke briefly with the client. They had discussed the file folder – which contained reference materials, historic clippings and the client's own rough-drawn sketches of renovation ideas that he had drawn on tracing paper – and which he had left with Kimball to reference. Although the folder had little to no monetary value, it did have a sentimental value to the client. Groll told the client that Kimball would be in touch to return his folder within the next day or so. But that did not happen, of course, through no fault of the Plaintiffs, but rather as a direct and proximate result of their lives having been turned upside-down by the actions of defendant Chovanec.

49. When the client next attempted contact, he discovered the now-shuttered office and disconnected phone lines. Unable to locate Kimball's mobile number, and not knowing where else to turn, he had naturally turned to the police for assistance.

50. Defendant Chovanec witnessed the profoundly-obvious state of chaos within the office, and the visibly-stressed state of the plaintiffs and their crew. The plaintiffs told him about the

impending deadline of the Sheriff's eviction just a few hours away, and that there was no way they'd be able to put their finger on the folder at that instant, but that they would certainly get it back to the client as soon as possible.

51. That wasn't good enough, however, for defendant Chovanec seemed to derive pleasure from once again threatening to arrest Kimball, this time if he failed to deliver the file folder to the police station *later that same evening*.

52. At *no point* did the client allege that Kimball had *stolen* the folder, nor was there any reason, value or benefit whatsoever that could possibly have compelled Kimball to do so. In fact, the following day, Groll told the client that Kimball was facing arrest, the client was shocked, and called defendant Chovanec to prevent that from happening.

53. It was Chovanec's own fault that the file was missing in the first place; had Chovanec not effectuated an illegal eviction, the file would never have gone missing.

54. Further, Kimball had consistently made his intentions clear, stating that he wished to return the folder to the client quickly. In short, absent of any allegations of wrongdoing, and absent of any evidence of a motive or of criminal intent or of exigent circumstances – coupled with the officer's own unclean hands in the entire matter of the plaintiffs' unlawful eviction – proves that defendant Chovanec had *no probable cause whatsoever* to justify this second threat of imminent arrest.

55. The Plaintiffs protested that it was impossible for them to locate the folder – on that given day of all days – and that it wasn't their fault that they couldn't even *access* the folder over the past two weeks, let alone return it.

56. Chovanec's response was, "Well, I don't know what to tell you – perhaps if you fulfilled your business obligations more often, *none* of this would have happened." This statement was made in the presence of the plaintiffs' friends on the moving crew.

57. Later that night, defendant Chief Jaran himself joined in the fun. He pulled his cruiser up to the curb, and asked, "Which one of you is Neal?" He then said, "Yeah, officer Chovanec told me before he went off duty that if you didn't get that folder to us tonight, we should go ahead and hook you up." This statement was also made in the presence of the plaintiffs' friends on the moving crew. Just as before, the plaintiffs' protests were callously and maliciously ignored.

58. Now, facing this *third* threat of arrest – this time from the Chief himself – and with not even twelve hours left before the Deputy Sheriff's scheduled arrival, the plaintiffs had no choice but to completely abandon their office move, and spend those last precious hours unpacking, sifting through, and re-packing *every single box* – over one hundred and fifty unlabeled and hastily-packed boxes in all. Some of them were still at the office, but by then, most of them were haphazardly-staged in a sea of boxes intermixed with office furniture and equipment, stacked at least waist-high in the plaintiffs' driveway, filling the entire area that normally held two cars. Worse still, the plaintiffs were forced to conduct this search outdoors, in the middle of the night with flashlights, in the cold of mid-December. Searching for that one simple file folder, which could have been literally anywhere, was akin to searching for a needle in a haystack.

59. It was extremely clear to the plaintiffs that defendants Chovanec and Jaran had conspired to make the unfounded threats of arrest arbitrarily, and with malicious intent, knowing and fully expecting it to cause further injury to the plaintiffs. Further still, they knew that if they arrested one or both of the plaintiffs, the shame and contempt that the plaintiffs would undoubtedly experience would virtually guarantee that the plaintiffs would not go forward with their previously-voiced intent to file a complaint against them. The plaintiffs knew this too, but were absolutely powerless to do anything about it, which only deepened their despair.

60. Plaintiffs managed to call the deputy sheriff about an hour before his scheduled arrival, and explained the situation, and managed to delay the eviction until the end of the business day.

That the Deputy Sheriff took the unusual step of delaying a scheduled eviction was a "stroke of luck" that neither the plaintiffs nor defendants expected; it also indicates that he recognized the extreme irregularity of the police's continued involvement in an eviction. While his delay mitigated some small portion of the totality of the potential injury the plaintiffs could have endured, substantial damage had already been done.

61. The client's folder was never found; the client ultimately sued Kimball in Small Claims Court and was awarded $1,200 in damages. Plaintiffs can only conclude that the folder may have accidentally been discarded in haste by one of their helpers. Nevertheless, that entire situation, including the loss of the client's folder, the loss of the client, and the client's claim against Kimball, would never have happened were it not for the actions of the defendants.

62. On Saturday, November 26, 2011 – just one week after his stunningly-successful use of his "15-minute-eviction" technique – defendant Officer Chovanec evicted a young pregnant female and her boyfriend, using the exact same "fifteen minutes to leave or be arrested" threat. The young couple was forced to throw their belongings out of the windows of their cottage in order to make it out on time. Two key differences in that instance were that: (a) it was a residential unit; and (b) the landlord had not filed any eviction paperwork whatsoever, and had not even sent the tenants a "Notice to Quit".

63. In August of 2013, citizens complained that defendant Chovanec, while acting under color of law as "Marine Patrol Officer", had trespassed onto private property, seized their beached boats, and had them destroyed as part of a "clean-up" of the beach. Citizens complained that these were "unreasonable seizures" that were carried out "without due process of law".

64. Back in 2006 and early-2007, the Town of Provincetown found itself with vacancies in the

positions of Town Manager and Chief of Police. Sharon Lynn, then Town Administrator of Goshen, Pennsylvania – and also a former police officer and detective – initially interviewed to be the Town's Chief of Police. She was hired instead in 2007 as its Town Manager, and one of her first official duties was to hire Jeff Jaran as Police Chief in early 2008.

65. Both Lynn and Jaran can count themselves among the one-tenth of one-percent (0.1%) of all police officers – an elite group, to say the least – to have graduated from training at the FBI National Academy.

66. Jaran, in turn, had hired Chovanec at the rank of Patrol Officer in December of 2010, after retiring from 23 years of service with the Milford, New Hampshire Police Department.

67. Jaran and Chovanec shared "common ground" as well, both having worked together previously as detectives on the New Hampshire Attorney General's Drug Task Force in the early 1990's.

68. During Jaran's tenure as Chief of Police, there were numerous complaints by citizens that he allowed, and even participated in, violations of citizens' civil rights. There were additional complaints alleging that he created an intimidating atmosphere where both employees of his department, and citizens in general, were discouraged from speaking out against police misconduct, and from expressing speech that was critical of the Department.

69. In 2013, the Provincetown Banner published an interview with Lynn, entitled, "Provincetown Town Manager Sharon Lynn grapples with 'police state' perception"[1] Two weeks later, the media began reporting a series of incidents in which Jaran was accused of civil rights abuses.

70. One such example, as widely-reported in the news media, occurred on election night in May, 2013. While at the victory celebration for Tom Donegan, the candidate for Selectman whom Chief Jaran referred to as the "anti-cop" candidate, the Chief was accused of abusing his

[1] Wood, Ann (5/26/2013). "Provincetown Town Manager Sharon Lynn grapples with 'police state' perception". Provincetown Banner. http://www.wickedlocal.com/article/20130526/News/305269872.

authority so as to threaten and intimidate the staff and patrons of the Squealing Pig, a local bar/restaurant, thereby depriving them of their First Amendment right to free speech.

71. When the bartender complained to the Town Manager, it was her duty to fairly and impartially investigate the matter — a responsibility she abdicated by corrupting her role of "impartial fact-finder" into that of "police interrogator." By so accusing the victim that he walked out of his “inquisition”, she thus suppressed the complaint. By further intimidating the victim of police intimidation, the Town Manager abused her authority as well, so as to deprive him of his First Amendment right to petition government for redress of grievances. Even in the face of new incriminating evidence, she steadfastly refused to reopen the "investigation", as did three out of five Selectmen. This example of the Town's deliberate indifference as to the Police Department's transgressions was just one of of many that came to light at around the same time.

72. In a second example, the Chief was accused of joining one of his sergeants in harassing, issuing threats and intimidating a resident via Facebook Messenger and via SMS text messages, simply because that resident allowed an election lawn sign saying “Vote for Tom Donegan” to be placed on his property. An “Internal Affairs” review of the complaint – one that was conducted by his direct subordinate, the Lieutenant, the Chief's second-in-command – who cleared his commanding officer of wrongdoing. When this fact was exposed, the Town Manager saw no need to further investigate the matter.

73. Jaran was suspended in September 2013 pending an independent investigation of civil rights and other allegations that had been leveled against him, both by citizens and by a nearly-unanimous letter containing a vote of no-confidence from the Town's two police unions, in which the police unions accused him of using the police station to distribute election signs for the “pro-cop” candidate, and for illegally coercing officers to vote for that candidate.

74. In that vote of no-confidence, defendant Chovanec and the aforementioned “text messaging”

sergeant were the only two officers to stand by their mentor and protector, voting in opposition to the unions' accusations.

75. As a result of the report generated by that independent investigation, Jaran was terminated in early December 2013.

76. Town Manager Sharon Lynn resigned as Town Manager at the end of December, 2013.

77. Officer Chovanec resigned from the police force in the spring of 2014.

78. In November 2013, the plaintiffs properly presented a demand letter to the Town of Provincetown for tort claims under the statutory requirement of M.G.L. Chapter 258 § 4. The letter was delivered in-hand to the Town Clerk, who accepted it and stamped it within the statutory time limit. The Town and the police department have ignored such letter.

79. The refusal to respond to the presentment letter after allowing the passage of six months has given the plaintiffs the right to raise the state law claims allowed by the statute and they are set forth in this complaint.

80. In the wake of these incidents, plaintiffs suffered from severe anxiety, acute stress, and insomnia throughout the spring and summer of 2012. They no longer felt safe in the Town, after having been threatened by both a line police officer, and also by the Police Chief.

81. In the Spring of 2013, Mr. Kimball began to experience severe chest pains, and believing he was experiencing another heart attack, was taken to the emergency room by ambulance. He was diagnosed with acute stress, with a stress-induced spasm of the interstitial muscle. He suffered a second heart attack in the fall of 2013.

82. Mr. Groll had even felt so intimidated that he was reluctant to be seen in public having coffee with Mr. Donegan – fearing that a police cruiser might drive by and see them together – that he requested that they instead meet in the Town of Truro.

## COUNT I
## VIOLATION OF CIVIL RIGHTS, 42 U.S.C. §1983 (WRONGFUL EVICTION AND CONVERSION – FIRST & FOURTEENTH AMENDMENTS) AGAINST DEFENDANTS CHOVANEC AND JARAN

83. The plaintiffs repeat and restate the allegations in each of the preceding numbered paragraphs, and incorporate said paragraphs as if specifically stated herein.

84. The Provincetown Police either knew or should have known that evictions in Massachusetts are carried out by the Sheriff, and not by the police. Over the course of 2 days and 3 separate incidents involving 3 different officers, plaintiffs made that abundantly clear to each of them. They explained to the officers the difference between a judgment and an execution, and said that the execution was still 6 days away. Each officer was asked why they were getting involved in a civil matter, and why the Sheriff was not present as required by law, but no answer was ever given to either question.

85. The dispatch logs clearly show that the Provincetown Police Department and defendant Officer Chovanec had advance knowledge that he would be participating as an agent of the Landlord, effectuating an eviction on his behalf. At no point did defendant Chovanec protest the illegality of what they were about to do.

86. The Landlord and Chovanec met the locksmith outside the building on November 18, 2011, and entered as one. Their actions clearly demonstrate a coordinated team effort, planned in advance of their entry.

87. When the Landlord and Chovanec arrived at the plaintiffs' office on November 19, 2011, they made it abundantly clear that they were both very frustrated that they had failed to remove plaintiffs on the previous day. On this day, there was no doubt that they both spoke with one voice and with one plan, in a conspiracy under color of law to deprive plaintiffs of their clearly-established constitutional rights by forcibly-evicting the plaintiffs from the property and

depriving them of their personal property without due process of law, in contravention of their Fourth and Fourteenth Amendment rights.

88. When on December 11, 2011 defendants Jaran and Chovanec further conspired to expand upon Chovanec's previous efforts, again under color of law to use threats, intimidation and coercion so as to unreasonably inject themselves into the middle of – and to knowingly, willfully and maliciously prevent the plaintiffs' successful completion of – the Summary Process, thereby forcing the plaintiffs, at the very least, to be deprived of their personal property and to suffer the additional expenses and humiliation of an execution, sheriff's eviction, storage fees, interest and other expenses, and at the most, to be unlawfully arrested over a missing file folder, a loss that defendant Chovanec himself had caused.

89. Any reasonable officer would have known and has a duty to know, under the circumstances, that the defendants' conduct was illegal; for under clearly-established, settled, indisputable constitutional law as it existed in 2011, the defendant officers each had 'fair warning' that their actions were unconstitutional; the defendants are therefore not entitled to claim qualified or absolute immunity in this instance.

90. By all of the actions described above, and as a direct and proximate result of the malicious, wanton and willful acts of the defendant officers, acting under color of law, the plaintiffs were intentionally and unlawfully deprived of their constitutional right to freedom from unreasonable seizures of their property by the State, and were denied the right of due process, as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, respectively, for the purposes of seizing and depriving plaintiffs of real and personal property without due process, so as to satisfy Chovanec's and Jaran's incorrect application of the Summary Process, and, later, seeking to arrest plaintiff Kimball so as to intimidate the plaintiffs and to prevent them from carrying out their previously-stated intent to file a formal complaint

against the officers. Plaintiffs were also permanently damaged in their reputation, embarrassed, prevented from engaging in their usual activities, caused to lose clients, caused to lose property, caused to have a small claims judgment entered against Kimball, thereby further damaging his credit rating, and caused to endure pain, suffering, physical exhaustion, and extreme mental anguish and suffering, all in violation of 42 U.S.C. § 1983.

91. Plaintiffs are thereby entitled to damages under the Fourth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. § 1983 and 1988.

## COUNT II
## VIOLATION OF MASSACHUSETTS CIVIL RIGHTS ACT: M.G.L. c. 12, § 11I (WRONGFUL EVICTION AND CONVERSION) AGAINST DEFENDANTS CHOVANEC AND JARAN

92. The plaintiffs repeat and restate the allegations in each of the preceding numbered paragraphs, and incorporate said paragraphs as if specifically stated herein.

93. As a direct and proximate result of the actions of the defendant Officer Chovanec, Chief of Police Jaran, and other officials of the Town of Provincetown, plaintiffs were subjected to harsh treatment, threats, intimidation and coercion, for the purposes of seizing and depriving plaintiffs of real and personal property without due process, and so as to satisfy Chovanec's and Jaran's incorrect application of the Summary Process, and, later, so as to intimidate plaintiffs and to prevent them from raising a complaint against the officers.

94. The defendants committed these violations of the plaintiffs' civil rights through the use of threats, intimidation, and/or coercion, causing plaintiffs to fear an imminent threat of harm.

95. Plaintiffs are therefore entitled to damages and relief pursuant to the the Declaration of Rights of the Massachusetts Constitution, and the Massachusetts Civil Rights Act, M.G.L. c. 12 § 11I, and under Massachusetts common law for wrongful eviction.

## COUNT III
## VIOLATION OF CIVIL RIGHTS, 42 U.S.C. §1983
## (MUNICIPAL AND SUPERVISORY LIABILITY)
## AGAINST DEFENDANT TOWN OF PROVINCETOWN

96. The plaintiffs repeat and restate the allegations in each of the preceding numbered paragraphs, and incorporate said paragraphs as if specifically stated herein.

97. With the knowledge of and/or under the direction of the Chief of Police, and with the knowledge of the Town Manager and other policy-making officials, the defendant Town of Provincetown had a custom and practice of permitting – and even encouraging – its officers in the Town of Provincetown Police Department to use their official status, under color of law, to intimidate, threaten, and coerce citizens in an outrageous pattern of abusive conduct aimed at depriving them of their constitutional rights, including their participation in unlawful evictions.

98. Defendant Chief and the defendant Town, pursuant to an unconstitutional custom or policy, have failed to adequately hire, train, supervise, control, investigate and discipline the defendant police officers who have denied plaintiffs their rights as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, as well as by the Massachusetts Constitution.

99. Defendant Chief and the defendant Town have been grossly negligent and deliberately indifferent in the training of police officers. The municipal policy makers have failed to provide minimally acceptable standards of training or instruction to police officers in contemporary and up-to-date law enforcement standards, policies and procedures, in a number of key areas of law governing landlord/tenant matters and trespass, the laws of Summary Process eviction, the laws governing probable cause to arrest and prosecute, constitutional rights of citizens, and civil liability of police officers; the end result was this highly-predictable consequence.

100. The Town of Provincetown has demonstrated a far-reaching and well-documented custom and

policy of deliberate indifference towards abusing the constitutional rights of citizens, which was the moving force behind the violation of plaintiffs' Fourth and Fourteenth Amendment rights, by:

a) Having a custom, demonstrated through the affirmative acts of its final police policy maker Chief Jaran, of directly threatening citizens and interfering with their constitutional rights;

b) Having a custom and informal policy, by and through its final policy maker Former Police Chief Jaran, of tolerating, and even promoting, interference and deprivation of the constitutional rights of its citizens;

c) Creating, and then tolerating, a culture in which officers interfere with the constitutional rights of its citizens;

d) Failing to take adequate disciplinary action against officers who violate the constitutional rights of citizens;

e) Failing to adequately investigate incidents and complaints of interference with the constitutional rights of citizens.

101. Plaintiffs are thereby entitled to damages from the Town of Provincetown for supervisory and municipal liability under the Fourth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. § 1983 and 1988.

**COUNT IV**
**NEGLIGENCE (M.G.L. Chapter 258 § 4)**
**BY DEFENDANT TOWN OF PROVINCETOWN**

102. The plaintiffs repeat and restate the allegations in each of the preceding numbered paragraphs, and incorporate said paragraphs as if specifically stated herein.

103. The defendant Town of Provincetown is liable to the plaintiffs for damages pursuant to M.G.L. Chapter 258 § 4 for negligent or wrongful acts or omissions of its police officers while acting within the scope of their employment.

104. The Town owed the plaintiffs a duty to properly train its officers to properly recognize an unlawful eviction, and to recognize that their involvement in such an action was also unlawful, and to make decisions based on proper due process and probable cause prior to making a threat of arrest, and the Town was negligent in its failure to so train its officers.

105. The fact that officer Chovanec took such an aggressive and arrogant attitude towards the plaintiffs establishes that he neglected to grasp his professional responsibility in this matter.

106. Each of the three officers involved in the three separate "landlord/tenant" calls over the course of two days neglected to explain why they were getting involved in a civil matter.

107. Each of the same officers were negligent as to the difference between a Default Judgment and a Writ of Execution for Possession. Nevertheless, even if they *had* in fact understood that distinction, each of them neglected to verify the Landlord's claims by requesting to review his documentation *of any kind;* instead, they simply took his word on blind faith.

108. Each of the same officers neglected to recognize that evictions in Massachusetts are performed *not* by them, but by the county sheriff.

109. Each of the same officers neglected to understand the difference between "keeping the peace" and active participation in an eviction, and that they *cannot legally participate actively* in an eviction, except at the request of said sheriff.

110. Each of the same officers neglected to recognize that *they,* together with the Landlord, were in fact trespassing. They neglected to prevent, but instead effectuated an unlawful entry and wrongful eviction.

111. Each of the same officers neglected to recognize that so-called "self-help" evictions – in which a landlord unilaterally changes the locks to circumvent the Summary Process, as was done in this instance – are *never* legal under Massachusetts law; not one officer saw anything wrong with that practice; rather than preventing its occurrence, they facilitated it.

112. This outrageous combination of failures, together with other negligent or wrongful acts of its police officers, amounts to gross negligence on the part of the Town.

113. The plaintiffs have suffered emotional and physical injury as a direct and proximate result of the negligent breach of duty to properly perform, which caused the plaintiffs harm. The plaintiffs have also suffered from the loss of clients, the monetary loss of a small claims judgment entered against Kimball, and the loss of stolen property, all as a direct and proximate result of that negligence.

114. The plaintiffs are thereby entitled to damages under M.G.L. Chapter 258 § 4, and other Massachusetts state laws.

**COUNT V**
**RECKLESS AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST DEFENDANTS CHOVANEC AND JARAN**

115. The plaintiffs repeat and restate the allegations in each of the preceding numbered paragraphs, and incorporate said paragraphs as if specifically stated herein.

116. Plaintiff Kimball suffers from high blood pressure, and had survived a heart attack one year earlier, in October 2010. He is also prone to panic attacks in stressful situations. One cannot even begin to imagine the stress levels that he, together with plaintiff Groll, were forced to endure while:

a) attempting to defend against three illegal and forcible entries by their Landlord and the Provincetown Police; and,

b) being unable to turn to the police for protection, because *the police* had assumed the *lead role* as the ultimate weapon in furtherance of said trespass and illegal seizure of his property; and

c) being intimidated, threatened and coerced by said police, whose threats of imminent arrest posed a very real and credible danger – which caused them to experience intense of fear of

imminently being harmed from false arrest, for – of all things – "*trespassing*" onto the premises from which they had every right to remove their personal property; and,

d) being stripped of their Fourth and Fourteenth Amendment rights, even though they knew that they were constitutionally theirs, albeit if only for one more week; and,

e) being publicly humiliated on a very busy street corner in the center of Town in broad daylight, by being summarily marched out of the building that Kimball once owned, escorted by the police and their Landlord, and carrying only those few boxes and bags that they managed to grab on the way out the door; and,

f) suffering irreparable loss of reputation and defamation of their character, becoming the latest "talk of the town" as a result of the above; and

g) for Kimball, being separated from his client files and tools of his trade, from his life's work, and from every drawing he had ever created, not knowing if he would ever see them again; and,

h) yet again being threatened, intimidated and coerced by said police, whose second and third explicitly-stated threats of imminent arrest posed still more very real and credible dangers – placing plaintiffs once again in fear of imminent harm from false arrest, over the loss of a client's folder – a loss that was *caused by the actions of the police themselves;* and

i) knowing that the additional threats of arrest were maliciously intended to intimidate them, to prevent them from seeking redress, and to cause additional economic, physical and emotional injury, deprivation of personal property and deprivation of their constitutional rights – and being completely powerless to do a single thing about it; and

j) being forced to abandon the office move to search for said folder by re-opening, unpacking and re-packing every one of 150+ boxes, outdoors, in the dark of night and in the cold of December; and

k) as a result of abandoning said move, being forced into jeopardy of a sheriff's eviction, and the possible loss of personal property therefrom; and

l) having expensive furniture stolen from the curbside; and

m) losing clients, being sued by them, and having an adverse judgment entered against them.

117. Plaintiffs suffered all of the above as a direct and proximate result of the conduct of the defendants, which was outrageous beyond all bounds of human decency and beyond that which a civilized society would tolerate.

118. Defendants knew or should have known that their willful, wanton or reckless behavior would inflict severe emotional distress upon the plaintiffs. Defendants acted with deliberate disregard for such distress.

119. The emotional distress suffered by the plaintiffs was severe and of a nature that no reasonable person could be expected to endure it. Plaintiffs in fact suffered severe and debilitating physical manifestations of mental and emotional distress and other damages as a result of the outrageous conduct of defendants Chovanec and Jaran.

120. Plaintiffs are thereby entitled to damages from defendants Chovanec and Jaran for Reckless and/or Intentional Infliction of of Emotional Distress.

## COUNT VI
## DEFAMATION
## OF PLAINTIFFS KIMBALL AND GROLL
## AGAINST DEFENDANT CHOVANEC

121. The plaintiffs repeat and restate the allegations in each of the preceding numbered paragraphs, and incorporate said paragraphs as if specifically stated herein.

122. The imputation of crime is defamatory per se.

123. By making statements that he knew or should have known to be untrue in the presence of plaintiffs' Office Manager and Landlord, and by alleging that the plaintiffs were trespassing and

were subject to arrest, and by escorting plaintiffs off of their property in plain view of the public when he had no right to do so, defendant Chovanec defamed plaintiffs Groll and Kimball.

124. As a direct and proximate result of defendant Chovanec's actions, both plaintiffs were publicly humiliated and suffered extreme emotional harm, suffered irreparable loss of reputation, defamation of their character, embarrassment, personal shame, degradation, loss of standing in the community, exposure to public contempt, severe mental anguish and suffering, and anxiety, and plaintiff Kimball also suffered debilitating and incapacitating panic attacks.

125. Plaintiffs Kimball and Groll are thereby entitled to damages from defendant Chovanec for Defamation.

## COUNT VII
## DEFAMATION
## OF PLAINTIFF KIMBALL
## AGAINST DEFENDANTS CHOVANEC AND JARAN

126. The plaintiffs repeat and restate the allegations in each of the preceding numbered paragraphs, and incorporate said paragraphs as if specifically stated herein.

127. In addition to the imputation of crime, statements that may prejudice one's profession or business are also defamatory per se.

128. By making statements that they knew or should have known to be untrue to plaintiff Kimball's client, and/or in the presence of plaintiffs' moving crew and/or Mr. Groll, and by imputing that plaintiff Kimball had stolen his client's folder, and by contesting the honesty of Kimball in the operation of his business affairs, and by stating that Kimball was subject to arrest when they had no right to do so, defendants Chovanec and Jaran defamed plaintiff Kimball.

129. As a direct and proximate result of the defendants' actions, plaintiff Kimball was publicly humiliated and suffered extreme emotional harm, suffered irreparable loss of reputation,

defamation of his character, embarrassment, personal shame, degradation, loss of standing in the community, exposure to public contempt, severe mental anguish and suffering, anxiety, debilitating and incapacitating panic attacks, and fear over the imminent loss of his personal property.

130. Plaintiff Kimball is thereby entitled to damages from defendants Chovanec and Jaran for Defamation.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs pray that this Court enter judgment on their behalf, and award:

a) appropriate compensatory damages to plaintiffs from the defendants jointly and severally in an amount to be determined by the Court;

b) punitive damages to plaintiffs from the individual defendants in an amount to be determined by the Court;

c) the plaintiffs' costs, interest and attorney's fees;

d) such other and further relief as this Court deems just, necessary and appropriate.

## JURY TRIAL

THE PLAINTIFFS HEREBY DEMAND A JURY TRIAL.

Dated: Dec. 11, 2014

Neal F.X. Kimball, *pro se*
49 Bayberry Avenue
Provincetown, MA 02657

nfxk135@gmail.com

(508) 654-3176

Dieter M. Groll, *pro se*
49 Bayberry Avenue
Provincetown, MA 02657

grolltech@gmail.com

(508) 654-3196