**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **NEAL F.X. KIMBALL**<br>Plaintiff,<br><br>v.<br><br>**TOWN OF PROVINCETOWN,**<br>**OFFICER SCOTT D. CHOVANEC,**<br>**CHIEF OF POLICE JEFF D. JARAN,**<br>Defendants. | **C.A. No. 1:14cv14391-WGY** |

# AFFIDAVIT OF DAVID D. MARTIN

COMMONWEALTH OF MASSACHUSETTS §
COUNTY OF BARNSTABLE §

Before me, the undersigned notary, before me personally appeared

I, David Daniel Martin, under pains and penalties of perjury do hereby declare that:

1. My name is David Daniel Martin, I am 56 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.
2. I currently reside at 86 Shore Road Unit 2B in North Truro MA 02652. I have lived on the Lower Cape for nearly 28 years – the first 18 years in Provincetown, and the last 10 years in North Truro.
3. While I am now disabled, I have previously owned two restaurants, an art gallery, and a taxicab company.
4. I have been acquainted with Plaintiffs Neal Kimball and Dieter Groll since 2007.
5. I have no relationship of any kind with the Defendants, nor had I ever met them personally, prior to the events described below.
6. On the morning of November 18, 2011, I was present in the office of Kimball Residential Designs, located on the second floor of 135 Bradford Street in Provincetown, Massachusetts, with both Neal

and Dieter. Shortly before 11 AM, Neal's office manager, Susan Leonard, with whom I had also been previously been acquainted, arrived.

7. On this day, our plan was to begin the process of packing up and moving out of Neal's office. We had just begun discussing and planning to begin the effort of packing and moving out of Neal's and Dieter's offices. Our plan had been to be out by Thanksgiving, to avoid a sheriff's eviction.
8. Shortly after 11AM, Neal's landlord Rick Campbell – whom I had just met a few weeks earlier on Halloween, dressed as an alien creature from outer space – entered through the locked main door without knocking. He was leading a team that included a police officer and a local locksmith.
9. Rick said something to the effect of, "OK, your time is up." He said that everyone had to leave, or he would have us removed. While he was saying this, the locksmith started changing the locks.
10. Dieter started to explain to Rick that he cannot evict without a court order. Rick claimed to have one, but Dieter disagreed, and said that the sheriff needed to be present – *not* a police officer. Dieter and Rick began to argue, and I think Rick kind of went over the top.
11. I felt very intimidated by the presence of the police officer. Susan was visibly shaken and scared, so upset that she started to cry amidst the arguing. She said to Dieter that she was going to go home and then left immediately.
12. Somehow, Dieter managed to get Rick to agree to give them a few more hours to gather themselves.
13. When I spoke to Neal by phone later that night, he told me that they had another run-in with Rick and more police officers, and that Dieter again bought more time. He told me they were camping out in the office overnight, too scared to leave and get locked out without their computers, client files and belongings.
14. On the following afternoon, November 19, 2011, I got a frantic call from Dieter, who said that the cops had just forced them out of the building under threat of arrest.
15. When I arrived at their house that afternoon, I witnessed Neal having a full fledged panic/anxiety attack – a state of being with which I am all too familiar. He was clearly very ill, collapsing emotionally under the weight of all the pressure, and he was completely incapacitated. Even worse,

he didn't have his anxiety medication, which he had left in the office.

16. The move was put on hold for the next several weeks, until Rick decided to grant access to remove their belongings. I met with Neal and Dieter and talked on the phone many times during this period, and they were extremely stressed.

17. Meanwhile, we had lost many of our crew, who left the Cape after Thanksgiving. I tried to get commitments from other friends to help with the move, but there were very few people left that we could turn to that late in the off-season.

18. By December 8th, the move project was back up and running again, but it was sheer chaos from having less time and less crew to pull it off. The place was a wreck with boxes and boxes everywhere, files and file drawers and construction tools. We were sorting quickly in the mayhem, literally throwing things out the window into the dumpster, including printers, old files, and non-essentials. No doubt some things were thrown into the dumpster that Neal probably would have saved, but the pace was brisk and brutal. We worked 12-14 hour days without stopping to eat. The job was a massive undertaking.

19. On Sunday, December 11, 2011 the same officer that threatened Neal weeks earlier showed up in the middle of the chaos. I heard the officer say that one of his clients, Raif Menold – with whom I am personally acquainted – needed his file folder back. I heard the cop say he needed it by that night.

20. Neal was doing some drawings for Raif, and I had helped Neal measure Raif's house for that effort. Raif had fancied himself an designer of sorts and had a couple cut-out pictures and some idea sketches that he had given to Neal.

21. The folder could have easily gone by way of the dumpster by accident. With so many hands working so quickly, I must admit it is possible that it received a “no intrinsic value, thumbs down” vote. But apparently it was valuable to Raif, and now Neal was going to go to jail if he couldn't find the folder.

22. Clearly, Neal was not at fault for the loss of the folder. I felt terrible about the situation and it hangs

thick in the air over the project still.

23. Later that night, a police cruiser rolled up behind the moving truck, which had just returned from unloading at the house. I recognized Chief Jaran from newspaper articles, and heard him telling Neal if he doesn't find the folder by the end of the night he's gonna “hook him up”.

24. The crew looked in the office while Neal and Dieter left and went to find the folder in one of the hundreds of boxes we had already packed and delivered to Dieter and Neal's driveway and house. It was never found.

Subscribed and signed voluntarily, under pains and penalties of perjury this 6th day of October, 2016.

Date: October 6, 2016

________________________________
David D. Martin
86 Shore Road, Unit 2B
North Truro, MA 02652
(774) 538-6057

WITNESSED:

Date: October 6, 2016

________________________________
John E. L'Heureux
49 Bayberry Avenue

Date: October 6, 2016

________________________________
Gregory M. Lee
129 Maple Ave
Shrewsbury, MA 01545

## CERTIFICATE OF SERVICE

I, Dieter M. Groll, hereby certify that on the below date, this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that I have caused paper copies to be mailed, postage prepaid, directed to those indicated as non-registered participants, if any.

Date: October 6, 2016

*/s/ Dieter M. Groll, pro se*
Dieter M. Groll, *pro se*